IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CHERIE NOELLE MANESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17CV384 |
| | ) | |
| CITY OF HIGH POINT, | ) | |
| NORTH CAROLINA, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on a Motion for Summary Judgment [Doc. #46] filed

by Defendant City of High Point, North Carolina ("Defendant"). In this case, Plaintiff alleges

that Defendant discriminated against her on the basis of her gender when she was not

promoted to the position of Major at the City of High Point Police Department, in violation

of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"),

and in violation of Plaintiff's rights under the United States Constitution pursuant to 42 U.S.C.

§ 1983. For the reasons set out below, the Court concludes that Defendant has presented

legitimate non-discriminatory reasons for the promotion determinations at issue, Plaintiff has

not presented any evidence that those reasons were simply a pretext for gender discrimination,

there are no genuine issues of material fact, and as a result, Defendant's Motion for Summary

Judgment should be granted and this case should be dismissed.

# I.    FACTS, CLAIMS, AND PROCEDURAL HISTORY

Plaintiff was sworn in as a police officer with the High Point Police Department in 1990. (Pl.'s Compl. [Doc. #1]at 4). The High Point Police Department employs approximately 280 officers and employees, with an increasingly smaller number of individuals at the highest levels as reflected by the record (Shultz Decl. [Doc. #47-2] at 2; Position Posting [Doc. #47-6] at 3):

| | |
|---|---|
| 31 | Lieutenants |
| 11 | Captains |
| 3 | Majors |
| 1 | Chief of Police |

Plaintiff was promoted to Lieutenant in 1998 and was promoted to Captain in 2005. (Summ. Report [Doc. #47-3].) However, since that time, she has not been selected for promotion to Major. The most recent opening for Major was in April 2016, and when Plaintiff was not selected for that position, she filed a grievance and then filed the present suit, alleging that the failure to promote her to Major was based on her gender.[1] The record generally reflects that while promotions to the positions of Lieutenant and Captain involve a formal, more objective process, the selection of the Majors is made informally in the discretion of the Chief of Police. The record reflects the following history of promotions to Major during the time since Plaintiff became Captain in 2005, under three separate Police Chiefs, as follows:

---

[1] Plaintiff also originally asserted a claim for gender discrimination in connection with the selection of Kenneth Schultz as Chief of Police in 2016, a position for which Plaintiff also applied. However, in her Response Brief, Plaintiff concedes and withdraws that claim, and specifically notes that, "Following discovery of the documentation of the objective process from the third-party contractor, plaintiff withdraws her substantive claim concerning defendant's failure to select her as Chief." (Pl.'s Resp. Br. [Doc. #59] at 8 n.3.) The record of the objective process from the third-party contractor reflects that Mr. Schultz scored higher than Plaintiff in that process, which involved various exercises and submissions, and Mr. Schultz had the highest assessment center score of all five final candidates. Given that Plaintiff now concedes that claim, the Court will not discuss that claim further.

Chief James Fealy (2003-2012 tenure)
    2007 opening:               Jim Tate selected
    2011 openings:             Kenneth Schultz and Eddie McCluney selected

Chief Martin Sumner (2012-2016 tenure)
    March 2012 opening:       Lawrence Casterline selected
    March 2014 opening:       Angela Tackett selected
    March 2015 opening:       Kenneth Steele selected

Chief Kenneth Schultz (2016-present)
    April 2016 opening:        Travis Stroud selected

Plaintiff is specifically challenging the failure to promote her in March 2015 and April 2016, although Plaintiff contends that she was more qualified than Mr. McCluney (2011), Mr. Casterline (2012), Ms. Tackett (2014), Mr. Steele (2015) and Mr. Stroud (2016).[2] Plaintiff testified that she believes she was denied a promotion to Major based on gender discrimination. (Maness Dep. at 129 [Doc. #47-14 at 28].) Plaintiff notes she had greater seniority than those selected and that her employee evaluations were always "exceeds expectations."[3] In response, Defendant contends that the selection of a Major was not based simply on seniority or past evaluations, as reflected by the fact that there were also males with

---

[2] Because the statute of limitations has expired with respect to Plaintiff's denials of promotion in April 2011 and March 2012, the Court considers those as part of the historical evidence but not as separate discrimination claims. EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 110 (1988); Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); Guseh v. N. Carolina Cent. Univ., 423 F. Supp. 2d 550, 560 (M.D.N.C. 2005).

[3] In her deposition, Plaintiff took the position that it would be unlawful to promote someone with less seniority. (Pl. Dep. at 195, 199 [Doc. #47-14 at 49, 50].) Plaintiff noted her longer history of doing quality work, her master's degree, and her history of "exceeding expectations" on her evaluations. (Id. at 277-78 [Doc. #47-14 at 64, 65.) Plaintiff also testified that she was better qualified because, "I'm a female, and I think the fact that diversity is required at that level is obviously the primary reason." (Maness Dep. at 279 [Doc. #47-14 at 66].) As to this last point, however, it is clear that Title VII "does not demand that an employer give preferential treatment to minorities or women." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 259 (1981). Instead, as discussed below, Title VII prohibits employers from making employment decisions based on unlawful criteria, such as denying a promotion based on the individual's gender.

more seniority who were not selected. In addition, Defendant notes that Plaintiff had a reputation for being "rigid" or "black and white" that made her less suited for the top management positions. This is reflected in a Human Resources investigation that was undertaken after Plaintiff filed her grievance. According to the investigation, it was reported that Plaintiff was rigid in her approach at times and had a reputation for not getting over discipline or performance issues that an employee has, a reputation for seeing things as black and white, and a "tendency to hyperfocus on individuals." (Maness Dep. at 202, 215, 216, 218 [Doc. #47-14 at 51, 52, 53, 54].) Discovery in this case included those contentions and the promotion decisions noted above, as set out sequentially below.

Chief Fealy (2003-2012 tenure) promoted Plaintiff to Captain in 2005. (Maness Dep. at 67 [Doc. #47-14 at 11].)[4] In 2007, Chief Fealy engaged a consultant to conduct a review of the High Point Police Department. The review noted the perception of favoritism or a "good old boy" system in the Department. The consultant noted that the perceived "good old boy" network was not defined just by gender, since males were excluded from the network as well. The consultant recommended that the Department provide additional opportunities for leadership and recommended that promotions be more transparent. (Oberle Dec. [Doc. #56-3] at 3.) Chief Fealy then solicited additional input from the captains, and that report concluded that the command staff "seems to agree that there have been some situations where some employees have received preferential treatment from friends who are ranking individuals," and that this type of favoritism towards friends can "affect morale." (Memo

---

[4] At the time of Plaintiff's promotion, 17 Lieutenants had the same or more experience, but Plaintiff was nevertheless promoted over them. (Schultz Decl. [Doc. #47-2] at 2.)

[Doc. #56-5] at 4.) Chief Fealy implemented several suggestions to help alleviate the perception of the "good old boy" network and address the issues that had been raised. (Id. at 4-5; Fealy Decl. [Doc. #47-5] at 1-2.)

Captain Fealy did not promote Plaintiff to Major in 2007 or 2011, but did move her into a position over the administrative unit, which was a "positive move" into a "springboard position." (Maness Dep. at 118 [Doc. #47-14 at 25].) According to Plaintiff, Chief Fealy told her that "your day will come" and "I'm sure that you'll be a major someday." (Maness Dep. at 127 [Doc. #47-14 at 26].) Chief Fealy testified that the Chief selected the three majors because they operated as assistant chiefs and it was "in the best interest of the department and to me as the chief to be able to select the people who were my closest advisors and people that I depended upon to be part of my work team." (Fealy Dep at 65 [Doc. #47-17 at 7]). Chief Fealy testified that Plaintiff's reputation among her troops was that many of them viewed her as being "very rigid" and "sometimes a little mean and retaliatory," and "once you were in the dog house with her, you couldn't get out." (Fealy Dep at 77 [Doc. #47-17 at 8].) Chief Fealy testified that Plaintiff's peers, including Captain Urger, Captain Thompson, and Captain Williams, all similarly reported to Chief Fealy regarding Plaintiff's reputation, creating a "combined picture" that Plaintiff had that reputation. (Fealy Dep. at 78 [Doc. #47-17 at 9].) Chief Fealy also testified that it was perceived that Plaintiff showed favoritism to certain employees. (Fealy Dep. at 80-81 [Doc. #47-17 at 11-12].) According to Chief Fealy, some people respected and followed Plaintiff's command but some did not and "[a] lot of people feared" Plaintiff. (Fealy Dep. at 83 [Doc. #47-17 at 13].) Chief Fealy did not necessarily share these feelings about Plaintiff, and noted that one of Plaintiff's lieutenants reported that

Plaintiff could be "pretty misunderstood" and "pretty relentless in her supervision." (Fealy Dep. at 103 [Doc. #47-17 at 16].) Plaintiff notes that Chief Fealy specifically assigned her to handle officers with significant disciplinary problems, and she was successful in that role. (Maness Decl. [Doc. #56-1] ¶¶ 13, 15.) Chief Fealy stated that he spoke to Plaintiff about these issues, and made sure that she understood that the department's philosophy "was that anytime we have a developmental issue with an employee who's not – not meeting the standards, that we develop that person and not break them, that we allow them an opportunity to earn their way out of the doghouse." (Fealy Dep. at 105 [Doc. #47-17 at 17].) Chief Fealy noted that he spoke to Plaintiff about "being very rigid and everything is black and white," and noted that he also used those words when discussing Plaintiff with the Majors at the time. (Fealy Dep. at 116 [Doc. #47-17 at 20].) Chief Fealy also testified that he still believed that Plaintiff had what it took to be a major "with a little bit more development and rounding off this – this little edge of her employees either misperceiving what she's doing or – or her actually doing it, once that was taken care of, I think she'd be – I think she'd be an excellent major." (Fealy Dep. at 115 [Doc. #47-17 at 19].)

When Chief Fealy retired in 2012, he recommended Marty Sumner to replace him as Chief. Chief Sumner (2012-2016 tenure) testified that when he selected Major Casterline in 2012, he considered all of the Captains for the position, and selected Mr. Casterline because he was a "really good negotiator" and "[h]e was really adept at working with either team members of the department who might have a conflict or working with a member of the community and being able to talk through the issue, calm them down, and reduce down to the simplest thing and work out problems, which was something I had seen him do over the

years." (Sumner Dep. at 55-56 [Doc. #47-15 at 5-6].) Chief Sumner also noted that Mr. Casterline had been involved in a focus deterrence project and was the most knowledgeable to be able to implement that project, which was a focus at the time. (Sumner Dep. at 54-57 [Doc. #47-15 at 4-7].) In addition, Chief Sumner noted that Mr. Casterline had good administrative skills, was a people person, was very innovative and creative, and created a well-rounded group with the other two majors. (Sumner Dep. at 55-57 [Doc. #47-15 at 5-7].) Chief Sumner noted that he considered Plaintiff along with all of the other Captains for the position, that almost all of the Captains including Plaintiff were qualified, and that he made the determination based on leadership ability and fit in the group. (Sumner Dep. at 64-65 [Doc. #47-15 at 11-12].) He noted that Plaintiff had "a reputation of if employees got on her bad side, they couldn't be forgiven or restored." (Sumner Dep. at 69 [Doc. #47-15 at 13].) He testified that this did not eliminate her from consideration, but was "something I would watch," and he was "picking the person most qualified; not eliminating the other nine or 10." (Sumner Dep. at 73 [Doc. #47-15 at 15].) Plaintiff alleges that she was more qualified because she had 22 years of service experience while Mr. Casterline had 21 years of service. (Maness Dep. at 283 [Doc. #62-1 at 7].)

For the next opening in March 2014, Chief Sumner selected Angela Tackett for promotion to Major. Plaintiff does not specifically challenge this decision since the promotion went to another female Captain. However, Plaintiff does contend that she was more qualified than Ms. Tackett because Plaintiff had achieved the rank of Lieutenant and Captain earlier and because Ms. Tackett's service had not been continuous. (Maness Dep. at 282 [Doc. #62-1 at 6].) As to the selection of Ms. Tackett, Chief Sumner noted that everyone was again in

consideration, and he selected Ms. Tackett because she had done well taking control in her most recent assignment, and she had been a good adviser for Chief Fealy. (Sumner Dep. at 89 [Doc. #47-15 at 19].) He noted that Ms. Tackett had prior investigative experience, was a strong leader, and that selecting her for the position was a "great decision" because she "performed fantastically" as a Major. (Sumner Dep. at 90 [Doc. #47-15 at 20].) Chief Sumner testified that he considered Plaintiff for the position but felt that Ms. Tackett was a "better fit." (Sumner Dep. at 90-91 [Doc. #47-15 at 20-21].) Plaintiff contends that Chief Sumner promoted Ms. Tackett because Ms. Tackett told him that he needed to promote a female or Ms. Tackett would go see an attorney. (Pl.'s Decl. [Doc. #56-1] ¶ 30(c)). However, Ms. Tackett testified at her deposition that she only told Chief Sumner that "there had never been a female Assistant Chief in High Point and that it would be nice if he would be the one to make that happen." (Tackett Dep at 28 [Doc. #47-16 at 2].) Chief Sumner noted that he did not take race or gender into account in making the determination, but ultimately selected Ms. Tackett as the best fit. (Sumner Dep. at 103, 91 [Doc. #47-15 at 26, 21].)

Major Tackett retired a year later, and Chief Sumner selected Ken Steele as the next Major. Chief Sumner noted that Mr. Steele had directly reported to him in the past. (Sumner Dep. at 99 [Doc. #47-15 at 23].) Chief Sumner stated that he selected Mr. Steele over Plaintiff because Mr. Steele "had been there for a long time as well," and he had "[v]ery good judgment," was "very well respected by the officers," and was "very much viewed as being fair in his dealings or his recommendations." (Sumner Dep. at 101-02, 221-22 [Doc. #47-15 at

24-25, 30-31]).[5]  In addition, Chief Sumner asked Major Tackett for her recommendation, and she recommended Ken Steele as her replacement.  (Tackett Dep. at 101 [Doc. #56-35 at 17].)  According to Major Tackett, Chief Sumner "had already said he wasn't going to promote [Plaintiff]" because "[h]e said that she saw everything black and white.  She had a reputation of going after employees rather than trying to change their behavior."  (Id.)  Major Tackett noted that she did not have personal knowledge of the basis for Plaintiff's reputation in this regard, but Major Tackett noted that it was what Chief Sumner had said at the time in 2015.  (Id.)  In terms of Plaintiff potentially being selected as Major in the future, Major Tackett said, "I don't know if I would recommend her or not.  To be honest with you, I don't know."  (Tackett Dep. at 102 [Doc. #56-35 at 18].)    Plaintiff contends that she was more qualified than Mr. Steele because she had 25 years of service and 10 years as Captain while Mr. Steele had 23 years of service and 7 years as Captain.  (Pl.'s Resp. Br. [Doc. #59] at 6.)  However, Defendant notes that at the time of Mr. Steele's promotion to major, four other male Captains also had as much or more experience than Mr. Steele but were not selected.  (Schultz Decl. [Doc. #47-2] at 3.)

When Chief Sumner retired, a third party was brought in to handle recruitment and selection of the new Chief.  Ultimately, Major Kenneth Schultz was chosen as the new Chief.  Chief Schultz then chose Travis Stroud to fill his spot as one of the three Majors.  Chief Schultz testified that in making that selection, he wanted a well-balanced team, and was looking

---

[5] Plaintiff's journal entries reflect that she did not get along well with Chief Sumner.  As early as October 2012, she wrote, "It is my opinion that Sumner has no use for me, for whatever reason he does not like me. . . . Some ways it has affected me: I am not as dedicated to the job any more – I still do good work and am conscientious, but I am not passionate or motivated as I once was."  (Maness Dep. Ex. 5 [Doc. #47-14 at 80]).  By 2014, she wrote, "I am hoping that Sumner leaves in 2015.  He is manipulative and evil.  I don't like him, nor trust him."  (Id. at 93.)

at personalities, performance, relationships between officers and the potential supervisor, levels of respect within the agency for an individual, and leadership qualities. (Schultz Dep. at 32-33 [Doc. #47-22 at 3-4].) Chief Schultz noted that all 11 captains were qualified to be a major. (Schultz Dep. at 40, 35 [Doc. #47-22 at 9, 6].) Chief Schultz testified that he selected Mr. Stroud because he took the lead on projects, was very proactive, was a "very mentoring supervisor," had a very strong relationship with officers, and was very positive. (Schultz Dep. at 82 [Doc. #47-22 at 14].) Past-Chief Sumner also noted that Mr. Stroud was "a leader among Captains." (Sumner Dep. at 222 [Doc. #47-15 at 31].) Plaintiff contends that she was more qualified because she had 26 years of service and 11 years as Captain while Mr. Stroud had 21 years of service and 5 years as Captain. (Pl.'s Resp. Br. [Doc. #59] at 7.) However, Defendant notes that at the time of Mr. Stroud's promotion to Major, seven other male captains had as much or more experience as Mr. Stroud but were not selected. (Schultz Decl. [Doc. #47-2] at 3.)[6]

With respect to the decision to select Mr. Stroud, Chief Schultz also noted that he had been Plaintiff's direct supervisor (Shultz Dep. at 33 [Doc. #47-22 at 4]), and that he did not think she was unfit to be a major (id. at 110 [Doc. #47-22 at 15]), but he did have concerns that "if she had a particular problem, a disciplinary action with an individual, that she tended to maintain that. Maintain an almost adversarial relationship with that individual going forward." (Shultz Dep. at 41 [Doc. #47-22 at 10].) Chief Schultz noted at least two occasions

_____

[6] Defendant also notes that in the four years preceding the March 2015 and April 2016 Major promotions, Mr. Steele and Mr. Stroud received equal or better scores on their employee evaluations than Plaintiff (Schultz Decl. [Doc. #47-2 and #50-3] at 3). Plaintiff contends that she had a longer history of good evaluations and that some of the evaluation forms were abbreviated versions that could not be fairly compared. Either way, the testimony reflects that all of the captains generally had equally good evaluations, and the other factors discussed above were considered in determining who would be selected for promotion to major.

when he was a Major when Plaintiff recommended discipline that he rejected as too harsh. (Shultz Dep. at 43-45 [Doc. #47-22 and #50-12.]) In her declaration, Plaintiff also described those incidents, and noted that Schultz "overruled" her recommendations, and that she "disagreed with both [of Schultz's] decisions but respected the fact that my supervisors had the right to make them," although Plaintiff further noted that, "I believe that my actions and recommendations were measured and absolutely necessary." (Pl. Decl. [Doc. #58-1] ¶ 35(g).) Plaintiff also described another incident in which she made a recommendation that Chief Schultz did not sustain, and Plaintiff noted that she "disagreed with the final action given the seriousness of the incident" but she "respected Chief Shultz's authority to make the final decision." (Pl. Decl. [Doc. #58-1] ¶ 35(h).)[7]

Plaintiff contends that none of her supervisors indicated any criticism of her management style until after she filed a grievance. (Maness Decl. [Doc. #56-1] ¶ 35(b).) Plaintiff acknowledges that Chief Fealy discussed with her the fact that she had a reputation among officers for being "rigid" or "black and white," but Plaintiff contends that Chief Fealy did not present this as a criticism, and that she otherwise "never received that criticism from any of [her] superiors." (Maness Decl. [Doc. #56-1] ¶ 24.) However, Plaintiff's own essays and journals include some self-reflection regarding her management style and temperament. In a paper she wrote for her master's degree program in 2006, Plaintiff set out her view of

---

[7] The Court notes that the details regarding these incidents were filed under seal to protect the private personnel information of individuals who are not parties to this case. The Court will separately address the motions to seal, but the Court has set out the information above to provide the relevant information as it relates to Plaintiff, without including the unnecessary details regarding the third parties.

leadership and law enforcement, and noted her personal views and her challenges. In the last

section, she wrote:

> Forgive: This is one of my greatest challenges as a leader. For some reason that I cannot quite explain, I bear the burden of every transgression of my officers and carry their failures as my own. I take things personally and constantly review my actions to see where I have gone wrong. I have a hard time forgiving the officer who deliberately commits policy violations or does not live up to my standards. This is an ongoing struggle for me and I am well aware of the fact that I must practice forgiveness and allow others to make mistakes. Personnel matters are a constant variable for the police leader. The best course of action is to hold officers accountable for their mistakes, take appropriate action, and then let it go. I wear my heart on my sleeve so it can be apparent when I am disturbed about something, plus I usually am not shy about letting it be known. When you have a great deal of ownership and loyalty to the cause, you only want to give your best and to have everyone around you do the same. Holding grudges and keeping resentments about shortcomings does not benefit anyone. I have to learn not to take each policy violation as a personal slap in the fact.

(Maness Dep. [Doc. #47-14] at 126.) In addition, Plaintiff's medical records include a self-

reflective summary prepared by Plaintiff in July 2010, which states:

> Hyper-focused/Fixated: I get focused on a particular detail and cannot let it go. I will hash over it and discuss it endlessly to seek some resolution, but I never can. I look at it from a hundred different angles and then start all over again. I may talk to multiple people to get their "take" on the issue and still not be satisfied. I am told most people would not devote ten second[s] to thoughts I can obsess over for hours. I blow things way out of proportion and believe small issues are such a big deal and I cannot understand why everyone else is not as alarmed as I. I will distort facts to prove my points.
> . . . .
> Irrational thoughts and behaviors: I can make accusations against others which have no apparent basis or merit.
> . . . .
> Mild Paranoia/Fear: Sometimes I feel as though people are out to screw me over, especially at work.

(Pl.'s Summ. Statement [Doc. #50-4] at 310-314.)[8]  Plaintiff also submitted a current

Declaration, setting out and defending her views:

> I have strongly believed over the years that in order to carry out our important mission of protecting the public, we need to be committed to excellence in our officers' performance.  We should encourage our officers always to do their best, praise them for their accomplishments, and hold them accountable when they do not meet our standards.  I have invariably credited officers working under me for their commitment and good performance and accomplishments – big and small – both publicly among their peers and privately in informal communications and in their evaluations.  By the same token, if an officer was not performing his assignments or meeting our standards, I did not hesitate to address the problems in a constructive manner.  That was my philosophy at all times; this is the philosophy of most of the command officers of the HPPD; and, in my view, that is the only acceptable philosophy of personnel management for a para-military organization that has such important obligations to the public.
> ….
> I am very black-and-white on the standards to be applied to officers' performance, including my own, and the need for our department and our officers to be accountable to the City and the public, and strive to be the best we can be in our important work.  . . . [T]hat does not mean I cannot accept mistakes and failures on the part of officers.  Everyone makes mistakes at times; it is how we respond to the mistakes that is important.  The implication that I am unable to excuse officers for the "mistakes" or failures to meet our standards is absolutely false.  . . . I believe in progressive discipline, I believe in making allowances for personal problems that might affect officers' performance, and I have always done so.

(Maness Decl. [Doc. #56-1] ¶¶ 16, 35(c).)  Similarly, at her deposition, Plaintiff testified as

follows:

> Q.     There's been a lot of talk about black and white almost to the point it sounds like a talking point at this point, and even you may have used it in terms of a mental health counselor.  What do you think of as black and white?  What does that mean to you?
> A. My definition of that phrase is to have a very defined sense of values and what's right and what's wrong.

---

[8] Plaintiff's medical records were filed under seal, and the Court will separately address the motion to seal.  However, the summary the Plaintiff prepared in 2010 is set out above to the extent it is relevant to the claims that Plaintiff elected to bring in this case.

Q. Okay. And does that interfere in any way with your discipline of employees?
A. No, sir.
Q. In your opinion, based on your long career with the police department, is a good strong feeling about what's right and wrong a good attribute to have?
A. Absolutely.

(Maness Dep. at 309 [Doc. #62-1 at 9].)

As a result of her denials of promotion, Plaintiff filed her charge of discrimination with the EEOC on June 16, 2016. (Pl.'s Compl. at 12.) The EEOC subsequently issued a Notice of Right to Sue on February 2, 2017. Thereafter, Plaintiff filed this action in this Court on April 28, 2017, asserting violations of Title VII and of her constitutional rights under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983. Plaintiff seeks compensatory damages as well as specific performance in the form of "immediate promotion to the position of Major." (Pl.'s Compl. at 13.) Plaintiff also seeks a declaration that "the acts, practices, and policies of [Defendant] were in violation of [Title VII] and the Constitution of the United States." (Pl.'s Compl. at 15.) After a period of discovery, Defendant filed a Motion for Summary Judgment [Doc. #46] as to both of Plaintiff's claims.

II.     STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Id. at 255. A court considering a motion for summary judgment must view all facts and draw all

reasonable inferences from the evidence before it in the light most favorable to the non-moving party.  Id.  The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact."  Temkin v. Frederick Cty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."  Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).  A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment.  See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials).  Rather, the party opposing summary judgment must point to specific facts in the record "showing that there is a genuine issue for trial."  Celotex Corp., 477 U.S. at 324 (internal quotation marks omitted).  "The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of [her] claim at trial."  Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

## III.   DISCUSSION

### A.  Title VII Claim for Sex Discrimination

In this case, the Court considers these summary judgment standards in the context of the framework established for Title VII claims. Title VII prohibits an employer from discriminating with respect to compensation, terms, conditions, or privileges of employment, because of a person's sex. 42 U.S.C. § 2000e–2(a)(1). If a plaintiff has no direct evidence of discrimination, she may use the burden-shifting scheme of McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973), and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Under that framework, if the plaintiff establishes a prima facie case of discrimination, the burden of going forward shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the alleged discriminatory act. Burdine, 450 U.S. at 253. Once the employer has offered a legitimate, non-discriminatory reason, the burden then shifts to the employee to prove that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. Id.; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," but "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred"). The ultimate burden of proving discrimination remains at all times with the plaintiff. Burdine, 450 U.S. at 253.

With respect to the denials of promotion which occurred in March 2015 and April 2016, to set out a prima facie case in this context, Plaintiff must present evidence that (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. Bryant v. Aiken Regional Medical Centers, Inc., 333 F.3d 536, 544-45 (4th Cir. 2003) (internal quotations omitted)). Here, Plaintiff is a

member of a protected class, as a female. Plaintiff asserts that she has "excelled in her performance" while employed by High Point Police Department and was qualified for the position of Major. On this point, while Plaintiff's supervisors set out various reasons why others were selected for promotion to Major instead of Plaintiff, they do not contend that she was not qualified. In addition, it is undisputed that in March 2015 and April 2016, male candidates with less seniority were selected instead. Defendant nevertheless contends that even if Plaintiff has established a prima facie case, it has set out a legitimate non-discriminatory reason for the decision to promote a male candidate instead of Plaintiff in each instance. Specifically, Defendant notes that seniority was not determinative for male or female candidates, that the individuals selected had specific experience and qualities that made them better for the position, and that Plaintiff's temperament and leadership style made her less suited to the senior management positions as compared to other Captains when considered for promotion to Major. The burden then shifts to Plaintiff to put forth a sufficient basis on which the jury could find that Defendant's stated reasons for failing to promote Plaintiff were not legitimate, but rather, were pretext for discrimination. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007) (noting that at this point, "the burden to demonstrate pretext has 'merg[ed] with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination'" (quoting Burdine, 450 U.S. at 256)).

In her Response Brief, Plaintiff contends that Defendant's stated reasons for failing to promote Plaintiff are subjective and are "inconsistent *post-hoc* explanations." (Pl.'s Resp. at 9.) Specifically, Plaintiff asserts that when Defendant was considering Plaintiff for promotion to Major, the Police Chiefs "relied solely on their subjective perceptions of Plaintiff's

qualifications…which are impossible to define by any objective means, and are malleable to the results they seek to justify." (Id. at 13.) Plaintiff contends that the subjective process used to select Majors "is inherently flawed, runs contradictory to basic principles of human resources and promotional best practices, and creates a greater likelihood of discrimination." (Pl.'s Resp. Br. [Doc. #59] at 12.) Plaintiff further cites to the deposition of Defendant's Director of Human Resources, who was asked whether "the lack of transparency in selection procedures or promotional procedures has the effect of hiding -- or can have the effect of hiding discrimination?" (Kirkwood Dep. at 57 [Doc. #56-34 at 6].) Director Kirkwood responded that "the lack of transparency in the process can give the appearance of an unfair process." (Id.) However, these arguments fail to address that though the criteria considered for each promotion may have been based in part upon subjective determinations, the given reasons for denying Plaintiff's promotions were nevertheless non-discriminatory. Further, Title VII does not require an objective or transparent hiring process. In addressing subjectivity in hiring decisions, the Fourth Circuit has held that

> Obviously it must be possible for employers legally to make employment decisions that disfavor qualified minority employees on the basis of a comparative evaluation of their qualifications with those of other applicants. Concededly, when that evaluation is to any degree subjective and when the evaluators are themselves not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision may be subject to particularly close scrutiny by the trial judge. But, as the Supreme Court pointed out in McDonnell Douglas itself, the mere fact that subjective criteria are involved in the reason articulated by an employer does not prevent according it sufficient rebuttal weight to dispel the inference of discrimination raised by the prima facie case.

Page v. Bolger, 645 F.2d 227, 230 (4th Cir. 1981) (citing McDonnell Douglas, 411 U.S. at 803).

Similarly, this Court has held that "[s]ubjective criteria may be used in assessing an employee's

eligibility for promotion" and that "[t]he subjective nature of the criteria alone does not render the criteria invalid." Chapman v. Lorillard Tobacco Co., 342 F. Supp. 2d 383, 390-91 (M.D.N.C. 2004). The ultimate issue is still whether Plaintiff was not selected because of her gender, which Plaintiff has failed to illustrate in this case. See McCarthney v. Griffin-Spalding Cty. Bd. of Educ.,791 F.2d 1549, 1552 (11th Cir. 1986) (holding that "Title VII does not require an employer to hire or promote the most qualified applicant; it only requires that the employer make such decisions without regard to race, sex, religion, color, or national origin."); Ousely v. McDonald, 648 F. App'x 346, 349 (4th Cir. 2016) ("When evaluating pretext, it is not within [the Court's] purview to question whether the employer's proffered basis for the disputed action 'was wise, fair, or even correct, ...so long as it truly was the reason for' the action." (quoting Laing v. Fed. Express Corp., 703 F.3d 713, 722 (4th Cir. 2013))).[9]

Here, although Defendant used some subjective evaluations of Plaintiff's qualifications to determine her eligibility for promotion, Plaintiff has failed to articulate how such evaluations were false or were pretext for gender discrimination. First, Plaintiff has failed to address Defendant's contention that Plaintiff's male counterparts were held to the same subjective scrutiny when similarly determining their eligibility for promotion. Specifically, when determining who to consider for promotion to Major, the various Chiefs considered factors such as "each Captain's specific skillset and what he/she could bring to the Executive Team" and "the Captain's personality type to determine who 'could complete and complement the

---

[9] Of course, there may be many good reasons for implementing a more formal, objective promotional system, including potentially avoiding the perception of discrimination, and thus potentially avoiding the filing of a lawsuit and the need for discovery. However, it is not the Court's role to sit as a "super-personnel" department dictating the type of system that should be used.

skills or weaknesses of the other two Majors.'" (Def.'s Br. at 9.)  In addition, with respect to seniority, it is undisputed that other male Captains with more experience than Mr. Steele and Mr. Stroud were also not promoted, and seniority was thus not the determining factor.[10] Similarly, Plaintiff contends that she was more qualified than Mr. Steele and Mr. Stroud based on her employee evaluations, but the record reflects that, like Plaintiff, the other Captains considered for promotion all had evaluations of "exceeds expectations," and in the four years preceding the March 2015 and April 2016 Major promotions, Mr. Steele and Mr. Stroud received equal or better scores on their employee evaluations than Plaintiff.  See also Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) ("Furthermore, the performance evaluation is a review of an employee's performance in her current position, while the process of selecting a person for a promotion involves a consideration of how that employee will perform in a different position. In other words, the performance evaluation and the interview selection stage, which involves an analysis of how the applicant meets the core and functional competencies of the position that is open, are not interchangeable. We do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." (quoting  DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir.1998)). Plaintiff has also failed to present any evidence that Mr. Steele did not have good judgment, or was not well-respected by the other officers, or was not viewed as being fair in his recommendations, nor has Plaintiff presented evidence that Mr. Stroud had not taken the lead on projects, was not proactive and positive, was not a mentoring supervisor, or did not have

---

[10] The Court also notes that Plaintiff's 25 years' experience compared to Mr. Steele's 23 years, and Plaintiff's 26 years compared to Mr. Stroud's 21 years, would not reflect that Plaintiff had demonstrably superior qualifications even if seniority and experience was considered.

a strong relationship with the officers he supervised, as cited by their respective Chiefs as the reasons for their selection.

Finally, the record is clear that that the various Chiefs had some concerns regarding Plaintiff's management style, at least as perceived by the officers she supervised, including Plaintiff's tendency to see things as "black and white," her inability to forgive, taking things personally, and holding grudges and keeping resentments about shortcomings. Defendant notes that Plaintiff was counseled about these issues, and Plaintiff admits that Chief Fealy discussed the issues with her. In addition, Plaintiff's own essays and journals reflect these same tendencies.[11] Plaintiff also admits that she recommended harsher discipline on several occasions but was overruled by Chief Shultz, and that she disagreed with Chief Schultz's determinations, and continues to disagree with those determinations. Plaintiff also in her deposition and Declaration defends the importance of seeing right and wrong clearly, even if that is perceived as being "black and white," and Plaintiff also notes the importance of holding officers she supervises to high expectations, including by imposing discipline as necessary. It is not this Court's role to determine whether Plaintiff's approach to internal employee management and discipline is preferable – those are determinations to be made by the Chief of Police and the City of High Point. Plaintiff clearly has an approach that differs, at least to some degree, from other managers in the Department, as recognized by several Chiefs and other Majors, and that approach was determined to be less suited for the higher level

_____

[11] Plaintiff contends that reference to her medical records reflects an invalid reliance on after-acquired evidence to justify an earlier employment determination. However, Defendant does not rely on the later evidence to justify the promotion determination. Rather, Defendant simply notes that the evidence in Plaintiff's own journals and essays corroborates the reasons previously given by Plaintiff's various supervisors for not selecting her for the position of major.

management position of Major, although Plaintiff continued to be appreciated for her work in her role as Captain. There is simply no basis to conclude that this is a "*post-hoc rationalization.*" As discussed above, Plaintiff admits that Chief Fealy discussed the issue with her during his tenure as Chief; the undisputed evidence reflects that Chief Fealy discussed this issue with other Majors at the time; Angela Tackett testified that Chief Sumner told her in 2015 that he was not going to promote Plaintiff specifically because of this issue; Plaintiff acknowledges that she disagreed with Chief Schultz's decision to overrule her disciplinary recommendations on several occasions; and Plaintiff's own essays and journals corroborate and confirm that these were issues for her. Indeed, as noted above, Plaintiff in her deposition and Declaration continues to defend her approach to discipline and employee management, which is simply not the approach that the Chiefs were looking for in a Major.

The Court notes that Plaintiff also contends that "[the] culture of the High Point Police Department, and its resulting pattern and practice of discrimination, has prevented [P]laintiff from rising to the top where she belongs." (Pl.'s Resp. Br. at 2). Plaintiff asserts that Defendant has a "history of gender discrimination" as evidenced by: (1) only having one female Major (Angela Tackett), who Plaintiff contends was promoted only because Ms. Tackett threatened litigation if a female was not promoted; and (2) by the existence of a "Good Old Boy Network," which was identified by the executive management consultant in 2007. (Pl.'s Resp. Br. at 9-11). However, as to the first contention, Plaintiff herself testified that she does not know of any other female who was denied a position as Major based on gender discrimination.

(Maness Dep. at 129 [Doc. #47-14 at 28].)[12]  In addition, Plaintiff has no admissible evidence to support her contention that Ms. Tackett threatened litigation if a female was not promoted to Major, given that Ms. Tackett testified that no such threat was made.[13]  As to the second contention, even if the 2007 report is considered, nothing in the report would provide a sufficient basis on which a jury could find that Plaintiff was not promoted to Major because of her gender, given the record set out above.[14]

Ultimately, the Court cannot conclude that Plaintiff has presented any evidence from which a jury could find that Defendant's given legitimate, non-discriminatory reasons are false or are a pretext for gender discrimination.  As a result, Plaintiff has not presented evidence which could lead a reasonable fact-finder to return a verdict in her favor, and the Court cannot conclude that a genuine issue of material fact exists warranting a denial of summary judgment.

---

[12] The Court also notes that Defendant presented an expert report concluding that "there were no statistically significant differences between the gender composition of those selected for Major and the gender composition ('benchmarks') of the 1) full-time law enforcement officers nationwide, 2) full-time law enforcement officers in cities similar in size to High Point, 3) full-time HPPD law enforcement officers, and 4) HPPD Captains."  (Expert Report, Def. Br. Ex. K at 1 [Doc. #47-12 at 2].)  Plaintiff has not presented a contrary or rebuttal report with regard to these statistics.

[13] In any event, Plaintiff's contentions regarding the circumstances of Ms. Tackett's promotion would not support the conclusion that the reasons given for selecting others (including Ms. Tackett) instead of Plaintiff were false and were simply a pretext for gender discrimination.

[14] Moreover, to the extent that Plaintiff makes reference to a pattern or practice claim, the Fourth Circuit has held that "individuals do not have a private, non-class cause of action for pattern or practice discrimination under § 1981 or Title VII." Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 759 (4th Cir. 1998), vacated and remanded in part on other grounds, 527 U.S. 1031 (1999); see also Williams v. Giant Food Inc., 370 F.3d 423, 430 n. 3 (4th Cir. 2004) ("Lowery ... held that an individual plaintiff (as opposed to a class action plaintiff) cannot pursue a cause of action based on a pattern or practice of discrimination or invoke the proof scheme described in International Brotherhood of Teamsters v. United States." (internal citation omitted)); Williams v. Aluminum Co. of Am., 457 F. Supp. 2d 596 (M.D.N.C. 2006).  Thus, there is no separate "pattern and practice" claim properly before the Court in this case.

B. 42 U.S.C. § 1983 Claim for Violation of Equal Protection

Plaintiff also brings a claim for an "equal protection violation" under 42 U.S.C. § 1983. An "equal protection violation" occurs when the state "den[ies] a person equal protection through the enactment, administration, or enforcement of its laws and regulations. Even though a state law is facially neutral, its administration or enforcement can effect an unequal application by favoring one class of persons and disfavoring another." Sylvia Dev. Corp. v. Calvert County., Md., 48 F.3d 810, 819 (4th Cir. 1995). To establish such a claim, the plaintiff has the burden of proving more "than the fact that a benefit was denied to one person while conferred on another," but rather, "that the state intended to discriminate." Id. The McDonnell Douglas framework as set out above applies to discrimination claims brought under both Title VII and § 1983. See Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004). Thus, because Plaintiff has failed to establish a case under Title VII, a claim brought under § 1983 should similarly fail.

III.    CONCLUSION

IT IS THEREFORE RECOMMENDED that Defendant's Motion for Summary Judgment [Doc. #46] be GRANTED.

This, the 16th day of November, 2018.

    /s/ Joi Elizabeth Peake    
United States Magistrate Judge
